**Christopher Clark**
Direct Dial: 1.212.906.1350
christopher.clark2@lw.com

53rd at Third
885 Third Avenue
New York, New York  10022-4834
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Orange County |
| Doha | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

# LATHAM&WATKINS LLP

November 7, 2014

<u>**VIA ECF**</u>

The Honorable Thomas P. Griesa
U.S. District Court for the Southern District of New York
United States Courthouse
500 Pearl Street, Room 1630
New York, NY 10007-1312

Re:   *NML Capital Ltd. v Republic of Argentina*, 08-cv-6978 (TPG) and related cases

Dear Judge Griesa:

As we have previously informed the Court, in August 2014, certain of the Euro Bondholders[1] ("Claimants") initiated an action entitled *Knighthead Master Fund LP v. The Bank of New York Mellon* (2014), Claim No. HC-2014-00070, before the English High Court of Justice, Chancery Division (the "English Court"), in London, England (the "English Proceedings").  We write to inform the Court of recent developments in that action and to provide notice to certain parties (as defined below) with a potential interest in the outcome of the English Proceedings pursuant to the November 6, 2014 Order (the "Order") of the Honorable Mr. Justice Newey of the English Court, attached hereto as Exhibit A.

On October 9, 2014, Claimants applied to the English Court for declarations clarifying the obligations of the Bank of New York Mellon ("BNY") in its capacity as indenture trustee for the Euro Bondholders.  Claimants seized the English Court of this matter because the Indenture[2] governing their rights and BNY's obligations is governed by English law.  Among other things,

---

[1] The Euro Bondholders are a group of investors holding euro-denominated bonds issued by the Republic of Argentina (the "Republic") pursuant to 2005 and 2010 exchange offers (the "Euro Exchange Bonds").  The Euro Bondholders are Knighthead Capital Management, LLC; Perry Capital, LLC, Monarch Master Funding 2 (Luxembourg) S.á.r.l.; QVT Fund IV LP; QVT Fund V LP; Quintessence Fund L.P.; and Centerbridge Partners LP (each on behalf of itself or one or more investment funds or accounts managed or advised by it).  The Claimants are Knighthead  Master Fund LP, RGY Investments LLC, Quantum Partners LP, and Hayman Capital Master Fund LP.

[2] The Euro Bondholders hold bonds issued by the Republic pursuant to a June 2, 2005 Indenture, as supplemented on April 30, 2010 (the "Indenture").

LATHAM&WATKINS LLP

Claimants sought declarations providing that (1) BNY is holding on an English law-governed trust the June 26, 2014 euro-denominated payments (the "Funds") that the Republic made to BNY for the benefit of the holders of Euro Exchange Bonds, and (2) as a matter of English law, an order of a foreign court is ineffective in varying a contract governed by English law.

On November 6, 2014, Mr. Justice Newey delivered his judgment (the "Judgment") in the English Proceedings, attached hereto as Exhibit B, which finds that:

- The present state of affairs is "rather unfortunate" because it purports to prevent the Euro Bondholders "indefinitely from obtaining access to money that had been due to them contractually and to which they would now be beneficially entitled." Exhibit B, ¶ 18.

- While this Court's August 6, 2014 order purporting to absolve BNY of liability for failing to transfer the Funds to their beneficial owners "may excuse [BNY] from any liability to holders of euro-denominated Exchange Bonds as a matter of *American* law, I find it hard to see how it can do so in the eyes of the English Courts, and the bonds in question are governed by English law." *Id.*, ¶ 13. (Emphasis in original).

- A declaration from the English Court that the Funds are "held on trust for the holders of the euro-denominated Exchange Bonds . . . (and, correspondingly, that the Republic has no beneficial interest in the money) is likely to be of interest to an American Court having to consider issues relating to the funds." *Id.*, ¶ 25.

Mr. Justice Newey indicated he was willing to issue the declarations sought by Claimants subject to providing certain parties with a potential interest in the outcome of the English Proceedings an opportunity to challenge the declarations. *Id.*, ¶ 27-28. Such potentially interested parties are defined in the Order as "[a]ny person with a current holding in a debt security issued by the Republic of Argentina under the terms of the Fiscal Agency Agreement dated 19 October 1994." Exhibit A, ¶ 4. At this time, Mr. Justice Newey did not consider it necessary to enter an interim injunction preventing BNY from transferring the Funds it holds in trust for the benefit of holders of Euro Exchange Bonds to parties other than their beneficial owners.

We do not ask the Court to take any action at this time, as the English Proceedings, which concern bonds that are governed by English law, are still ongoing before the English Court. We expect this Court to allow the English Court to consider input from those parties put on notice under the properly-constituted English Proceedings. Once Mr. Justice Newey has had opportunity to hear from such potentially interested parties and issues his final decision, we will apprise Your Honor of any further relief the Euro Bondholders may seek from this Court.

Accordingly, we hereby provide notice in accordance with the terms of the Order, *see* Exhibit A, ¶ 2, by serving a copy of the Judgment and the Order on all counsel of record in *NML*

LATHAM&WATKINS LLP

*Capital Ltd. v Republic of Argentina*, 08-cv-6978 (TPG) and the cases designated by this Court as related thereto via the ECF system of the Court.

          Regards,

          /s/ Christopher J. Clark

          Christopher J. Clark
          of LATHAM & WATKINS LLP

cc:    All counsel of record

Encl.

# Exhibit A

IN THE HIGH COURT OF JUSTICE  CLAIM NO: HC-2014-00070
CHANCERY DIVISION

BEFORE MR JUSTICE NEWEY
THURSDAY 6 ~~DECEMBER~~ NOVEMBER 2014

B E T W E E N:



(1) KNIGHTHEAD MASTER FUND LP
(2) RGY INVESTMENTS LLC
(3) QUANTUM PARTNERS LP
(4) HAYMAN CAPITAL MASTER FUND LP

**Claimants**

AND

(1) THE BANK OF NEW YORK MELLON
(2) THE BANK OF NEW YORK DEPOSITARY (NOMINEES) LIMITED

**Defendants**

## ORDER

**UPON** the hearing of the Claimants' application for interim declarations and interim injunctions issued on 9 October 2014;

**AND UPON** the Claimants limiting the relief they were seeking to that set out in paragraphs 20(a), (b) and (c) of the Judgment of Mr Justice Newey dated 6 November 2014 ("the Judgment")

**AND UPON** reading the contents of the witness evidence and written submissions filed by the parties

**AND UPON** hearing Leading Counsel for the Claimants and Leading Counsel for the Defendants

**IT IS ORDERED that:**

1. The hearing of the Claimants' application for declarations in the terms set out in paragraphs 20(a) and (b) of the Judgment be adjourned to the hearing already listed for 17, 18 or 19 December with a time estimate of one to two days.

2. The Claimants shall by no later than 4.00pm (New York Time) on 7 November 2014 serve a copy of this Order and the Judgment on all counsel of record before the United States District Court for the Southern District of New York in the case of NML Capital Ltd. v Republic of Argentina, 08-cv-6978 (TPG) and the cases that Court has designated as related thereto via the Electronic Case Filing system of that Court.

3. Any counsel of record referred to in paragraph 2 may, by email to the Claimants' solicitors, request an electronic copy of the hearing bundle and skeleton arguments in this application, a copy of the transcripts of the hearings of 3 and 6 November 2014 and a copy of the Judgment of Mr Justice Newey handed down on 6 November 2014. The Claimants' solicitors shall supply the requested documentation within three business days of receipt of such request.

4. Any person with a current holding in a debt security issued by the Republic of Argentina under the terms of the Fiscal Agency Agreement dated 19 October 1994 may apply to be heard at the adjourned hearing of the Claimants' application.

5. Any such person wishing to be so heard shall notify the Claimants' solicitors of their intention to make such application by no later than 4.00pm (UK time) on 21 November 2014 (each person so notifying a "Non-Party Applicant"). The Claimants' solicitors shall, as soon as reasonably practicable after receiving such notification, inform the Defendants' solicitors thereof.

6. The Claimants' solicitors shall within one business day of receiving notification from a Non-Party Applicant in accordance with paragraph 5, provide such Non-Party Applicant with an electronic copy of the hearing bundle and skeleton arguments in this application, a copy of the transcripts of the hearings of 3 and 6 November 2014 and a copy of the Judgment of Mr Justice Newey handed down on 6 November 2014.

7. Each Non-Party Applicant must file with the Court and serve on both the Claimants' and Defendants' respective solicitors any witness evidence and written submissions upon which it wishes to rely by no later than 4.00pm (UK time) on 5 December 2014.

8. The Claimants and Defendants may, if so advised, file and serve on the Defendants or Claimants respectively, and on any Non-Party Applicant, any further witness evidence and written submissions in reply by no later than 4.00pm (UK time) on 12 December 2014.

9. The Claimants shall no later than 4.00pm on 15 December 2014 serve copies of the updated hearing bundle on the Defendants and any Non-Party Applicants.

10. The contact details of the Claimants' and Defendants' solicitors for the purposes of this Order are as stated in Appendix 1.

11. The application for an interim injunction against the First Defendant as set out in paragraph 20(c) of the Judgment is dismissed.

12. Save as set out above, there be no order on the Claimants' application dated 9 October 2014.

13. Costs reserved.


**Dated 6 November 2014**


## APPENDIX 1

### Contact details for the parties' solicitors

**Claimants:**

Reynolds Porter Chamberlain LLP
Tower Bridge House
St Katharine's Way
London
E1W 1AA
Ref: TYH/JSH/KNI49.1
Email: Tom.Hibbert@rpc.co.uk and Jake.Hardy@rpc.co.uk


**Defendants:**

Allen & Overy
One Bishops Square
London
El 6AD
Ref: ANDD 0010145-0001330 LT:12371432.1
Email: Andrew.Denny@AllenOvery.com and Kate.Dewire@AllenOvery.com

# Exhibit B



Neutral Citation Number: [2014] EWHC 3662 (Ch)

Case No: HC14B03236

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Rolls Building, Royal Courts of Justice
7 Rolls Buildings, Fetter Lane
London, EC4A 1NL

Date: 06/11/2014

**Before** :

**MR JUSTICE NEWEY**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

|   |   |
|---|---|
| (1) **KNIGHTHEAD MASTER FUND LP** <br> (2) **RGY INVESTMENTS LLC** <br> (3) **QUANTUM PARTNERS LP** <br> (4) **HAYMAN CAPITAL MASTER FUND LP** | **Claimants** |
| - and - | |
| (1) **THE BANK OF NEW YORK MELLON** <br> (2) **THE BANK OF NEW YORK DEPOSITARY (NOMINEES) LIMITED** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Mark Hapgood QC, Mr David Quest QC and Mr David Simpson** (instructed by **Reynolds Porter Chamberlain LLP**) for the **Claimants**
**Mr Robert Miles QC and Mr Andrew de Mestre** (instructed by **Allen & Overy LLP**) for the **Defendants**

Hearing date: 3 November 2014

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

**Mr Justice Newey :**

1. I have before me applications by the claimants, who hold securities issued by the Republic of Argentina ("the Republic"), for certain declarations and injunctive relief.

2. During the 1990s, the Republic issued bonds governed by a "Fiscal Agency Agreement" dated as of 19 October 1994 ("the FAA"). The FAA provided, by paragraph 1(c), for the bonds to "rank pari passu and without any preference among themselves" and for the Republic's payment obligations under the bonds to "rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness". The FAA also stated that it was to be governed by, and interpreted in accordance with, the laws of the State of New York. It contained, too, a provision under which the Republic accepted the jurisdiction of the Courts of New York City in respect of any action brought by a bondholder arising out of or based on the bonds or the FAA.

3. In 2001, the Republic defaulted on its debts. In subsequent years, holders of some 93% of the bonds governed by the FAA ("the FAA Bonds") agreed to exchange those bonds for new ones ("the Exchange Bonds") at a rate of 25-29 cents in the dollar. They thus agreed to forego between 71% and 75% of the principal payable under their FAA Bonds.

4. Some of the Exchange Bonds were denominated in US dollars, others in Argentine pesos, and others again in euros. The euro-denominated bonds were issued pursuant to an indenture dated as of 2 June 2005. Under this indenture ("the Indenture"), securities were to be governed by either New York law or, if so stated, English law. Where a series of securities was to be governed by English law, then (under section 12.7, as amended in 2010) the Indenture, the securities and "any non-contractual obligations arising out of or in connection therewith" were to be "governed by and construed in accordance with the laws of England & Wales without regard to principles of conflict of laws, except with respect to authorization and execution by the Republic", as to which Argentine law was to apply. Further, as regards securities governed by English law, the Republic irrevocably submitted to the jurisdiction of the Courts of England "with respect to any suit, action or proceeding against the Republic or its properties, assets or revenues arising out of or in connection with" the Indenture or the securities.

5. The Bank of New York Mellon ("the Bank"), which is the first defendant to the present proceedings, became the trustee of the euro-denominated Exchange Bonds, which were expressed to be governed by English law. The Indenture provided for the Republic to put the Bank in funds in advance of each payment of interest or principal to bondholders. Section 3.5 of the Indenture dealt with what was to happen to such money. It stated:

> "Subject to actual receipt of such funds in accordance with this Section 3.5(a), the Trustee [i.e. the Bank] shall apply such amount to the payment due on such Payment Date. Pending such application, such amounts shall be held in trust by the Trustee for the exclusive benefit of the Trustee and the Holders entitled thereto in accordance with their respective interests and

    the Republic shall have no interest whatsoever in such amounts."

  In similar vein, section 3.1 of the Indenture provided:

    "All monies (save for its own account) paid to the Trustee under the Debt Securities and this Indenture shall be held by it in trust for itself and the Holders of the Debt Securities in accordance with their respective interests to be applied by the Trustee to payments due under the Debt Securities and this Indenture at the time and in the manner provided for in the Debt Securities and this Indenture."

6. The securities themselves conveyed the same message. The terms and conditions to be found on the reverse of the securities stated:

    "All money paid to the Trustee pursuant to these Terms shall be held by it in trust exclusively for itself and the Holders of the Securities in accordance with their respective interests to be applied by the Trustee to payments due on the Securities or to the Trustee at the time and in the manner provided for in these terms and in the Indenture…."

7. The second defendant, a company associated with the Bank, is the "Holder" (within the meaning of the Indenture) of the bonds governed by the Indenture.

8. As, however, is implicit in what I have already said, the holders of some of the FAA Bonds declined to exchange them ("the Holdout Creditors"). A number of Holdout Creditors brought proceedings against the Republic in the United States District Court for the Southern District of New York, and in December 2011 the Hon. Thomas P. Griesa held that the Republic was required to rank its payment obligations pursuant to the remaining FAA Bonds at least equally with its other external indebtedness. On 23 February 2012, Judge Griesa made a further order (amended on 21 November 2012) requiring the Republic to perform its obligations under the FAA. This order stated that the Republic was to make a "Ratable Payment" to the plaintiff ("NML") whenever it pays any amount due on the Exchange Bonds. Among other things, the order stipulated as follows:

    "d. The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

    e. Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ('Participants'). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this

> ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.
>
> f.   'Participants' refer to those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds, including: (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a The Bank of New York); (2) the registered owners of the Exchange Bonds and nominees of the depositaries for the Exchange Bonds (including but not limited to … The Bank of New York Depositary (Nominees) Limited [i.e. the second defendant]) …."

The order went on to say this:

> "The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval by the Court."

"Ratable Payment" was defined in such a way that, if the Republic paid the interest outstanding on the Exchange Bonds in full, it had to pay the totality of all the principal and interest for which the relevant FAA Bonds provided.

9.   The Financial Markets Law Committee has expressed the view that the English Courts would construe pari passu clauses differently from Judge Griesa and that they would probably also take a different approach to the grant of remedies (see the Committee's "Issue 79 – pari passu clauses" and its subsequent memorandum on "Role, use and meaning of pari passu clauses in sovereign debt obligations as a matter of English law"). Whether or not that is right is, however, of little or no significance. The pari passu clause in the FAA has been definitively interpreted in accordance with its governing law by a Court with jurisdiction.

10.  The Bank challenged the scope of the injunction granted by Judge Griesa. It contended that "the Court should amend the Injunction as necessary to clarify that it does not apply to [the Bank] in its capacity as indenture trustee under the Indenture". On 23 August 2013, however, the United States Court of Appeals for the Second Circuit affirmed Judge Griesa's order in this as well as other respects. Attempts were made to take the matter to the United States Supreme Court, but the appeal was rejected on 16 June 2014. Two days later, the stay to which Judge Griesa's order had hitherto been subject was lifted.

11. Very shortly after that, on 26 June 2014, the Republic transferred €225,852,475.66 to an account that the Bank holds with Banco Central de la Republica de Argentina in Argentina. The payment was made in respect of interest falling due on the euro-denominated Exchange Bonds on 30 June. There was no attempt to make any payment on the outstanding FAA Bonds.

12. NML returned to Court on 27 June 2014. Its attorney complained to Judge Griesa that the Republic had "defiantly and contemptuously" violated the Judge's order. The Bank's attorney submitted that "the money under the indenture is held in trust for the Bank of New York Mellon as trustee and the bondholders", and an attorney appearing for holders of euro-denominated Exchange Bonds questioned whether the Court had "jurisdiction to issue an order nullifying that payment or perhaps ordering the return of those funds". Judge Griesa nevertheless considered that "the money should simply be returned to the Republic, simple as that". The money should, Judge Griesa observed, "never have been paid, and it should be returned".

13. In the event, the order that the parties submitted to Judge Griesa, and which he approved, did not provide for the money that the Republic had paid to be returned to it. Having recorded that the payment was "illegal and a violation of the Amended February 23 Orders", the order stipulated that the Bank was to retain the funds pending further order of the Court. The order also stated that the Bank would "incur no liability under the Indenture governing the Exchange Bonds or otherwise to any person or entity for complying with this Order and the Amended February 23 Orders". While, however, that may excuse the Bank from any liability to holders of euro-denominated Exchange Bonds as a matter of *American* law, I find it hard to see how it can do so in the eyes of the English Courts, and the bonds in question are governed by English law.

14. In August 2014, certain Holdout Creditors applied to the District Court for an order directing the Bank to "turnover" the funds it held so that judgments they had obtained against the Republic could be satisfied. On 27 October, however, the motions were denied by Judge Griesa. He explained as follows:

> "Plaintiffs' motions are denied because the funds are located outside the United States in [the Bank's] accounts at BCRA. Federal Rule of Civil Procedure 69 and New York Civil Practice Law and Rules § 5225(b) allow turnover in certain circumstances where, *inter alia*, a movant shows that the judgment creditor has an interest in the property. However, the Foreign Sovereign Immunities Act, which governs the arrest, execution, or attachment of the property of a foreign sovereign, does not authorize attachment or execution of sovereign property located *outside* the United States …. Thus, even if plaintiffs show that the republic has an interest in the funds, which the court does not reach, turnover would not be authorized by the FSIA. In dealing with what <u>can</u> be subjected to turnover, the FSIA simply does not mention property located outside the United States."

15. By now, the Republic had taken steps to replace the Bank as the trustee of the Exchange Bonds governed by the Indenture. In a notice published on 22 September

2014, the Republic said that it had requested the Bank to resign in accordance with section 5.8 of the Indenture and that, if the Bank did not resign immediately, "both the Exchange Bondholders and the Republic of Argentina are entitled to remove it as trustee and appoint another entity as successor trustee, in accordance with Section 5.9 (b) and (c) of the Trust Indenture".

16. NML once again alleged that the Republic was flouting Judge Griesa's orders. Judge Griesa found that the Republic was in civil contempt of Court, but deferred consideration of sanctions. The order stated that to purge its contempt:

> "The Republic of Argentina will need to reverse entirely the steps which it has taken constituting the contempt, including, but not limited to, re-affirming the role of The Bank of New York Mellon as the indenture trustee and withdrawing any purported authorization of Nación Fideicomisos, S.A. to act as the indenture trustee, and completely complying with the February 23, 2012 injunction".

In his judgment, Judge Griesa had said:

> "Two things are necessary this afternoon. One is this Court to make a very clear ruling that the proposals are illegal: The proposal to displace the indenture trustee, the proposal to move the affairs about these bonds to Argentina, move them away from the United States; and the proposal to make interest payments to the exchange bondholders without recognising the other very important part of the obligations of the Republic and that is obligations to the people who did not exchange and who have the bonds still. The Court holds and rules that those steps, those proposed steps are illegal and cannot be carried out."

17. As things stand, there appears to be one outstanding motion in the New York proceedings. This was launched on 29 June 2014 by some of the holders of euro-denominated Exchange Bonds. It asks the Court to determine that the injunctions granted by Judge Griesa "do not apply to the foreign parties who process payment on the Euro Bonds". I gather that the Court has heard brief oral submissions on the motion, but it has not yet been finally disposed of.

18. It can, perhaps, be observed that if, as the Indenture and securities suggest, money paid to the Bank by the Republic in discharge of its obligations under the Exchange Bonds is held on trust for the second defendant and, ultimately, the bondholders, the present position is rather unfortunate, albeit explicable by the understandable concern of the United States Courts that their orders should be obeyed: the bondholders (who, or whose predecessors, will already have had to agree to take far less than the face value of the FAA Bonds that they will once have held) would be liable to be prevented indefinitely from obtaining access to money that had been due to them contractually and to which they would now be beneficially entitled.

19. The proceedings before me were issued on 21 August 2014. By them, the claimants, who are holders of euro-denominated Exchange Bonds, seek declarations that the €225 million which the Republic paid to the Bank on 26 June 2014 is held on trust for

the second defendant and the beneficial holders of the euro-denominated Exchange Bonds and that the Bank has acted in breach of its obligations under the Indenture by failing to transfer the money to the second defendant. The claimants also ask for orders for, among other things, the distribution of the €225 million to the second defendant and on to the beneficial holders of the relevant bonds and restraining the Bank from dealing with or disposing of the €225 million other than by paying the money to the second defendant.

20. The application with which I am concerned was initiated by an application notice dated 9 October 2014. In the course of argument, Mr Mark Hapgood QC, who appeared with Mr David Quest QC and Mr David Simpson for the claimants, narrowed somewhat the relief sought. By the close of submissions, the claimants were asking for (a) a declaration that the €225 million is held on the English law trust for which section 3.1 of the Indenture provides, (b) a declaration that, as a matter of English conflicts of law, an order of a foreign Court is ineffective in varying a contract governed by English law and (c) an interim injunction restraining the Bank until the conclusion of the trial or further order from dealing with or disposing of the €225 million (or any other funds paid to it by the Republic in respect of the euro-denominated Exchange Bonds) other than by paying the money to the beneficial holders of the bonds or the second defendant. As regards (b), it was proposed, not that the declaration should be granted here and now, but that the application should be adjourned on the footing that notice of it would in the meantime be given to the New York attorneys on the record for Holdout Creditors, and Mr Hapgood accepted that it could make sense to adjourn the application for the other proposed declaration (i.e. (a)) on the same basis. He asked, however, for the injunction to be granted now.

21. Mr Robert Miles QC, who appeared with Mr Andrew de Mestre for the defendants, argued that it could not be appropriate for the Court to grant either of the declarations sought. In support of his submissions, he referred to the judgment of Aikens LJ in *Rolls-Royce plc v Unite the Union* [2009] EWCA Civ 387, [2010] 1 WLR 318. In paragraph 120, Aikens LJ summarised the principles applicable to the grant of declarations in these terms:

> "For the purposes of the present case, I think that the principles in the cases can be summarised as follows.
>
> (1) The power of the court to grant declaratory relief is discretionary.
>
> (2) There must, in general, be a real and present dispute between the parties before the court as to the existence or extent of a legal right between them. However, the claimant does not need to have a present cause of action against the defendant.
>
> (3) Each party must, in general, be affected by the court's determination of the issues concerning the legal right in question.
>
> (4) The fact that the claimant is not a party to the relevant contract in respect of which a declaration is sought is not fatal

>   to an application for a declaration, provided that it is directly affected by the issue; (in this respect the cases have undoubtedly 'moved on' from *Meadows*).
>
>   (5) The court will be prepared to give declaratory relief in respect of a 'friendly action' or where there is an 'academic question' if all parties so wish, even on 'private law' issues. This may particularly be so if it is a 'test case', or it may affect a significant number of other cases, and it is in the public interest to decide the issue concerned.
>
>   (6) However, the court must be satisfied that all sides of the argument will be fully and properly put. It must therefore ensure that all those affected are either before it or will have their arguments put before the court.
>
>   (7) In all cases, assuming that the other tests are satisfied, the court must ask: is this the most effective way of resolving the issues raised? In answering that question it must consider the other options of resolving this issue."

22. With respect to the proposed declaration that the €225 million is subject to a trust, Mr Miles pointed out that it is not in dispute between the claimants and the Bank that the €225 million is held on trust on the terms of the Indenture. That being so, Mr Miles said, sub-paragraph (2) of Aikens LJ's summary of the law is in point: there is no "real and present dispute between the parties before the court as to the existence or extent of a legal right between them". Further, a declaration would serve no useful purpose.

23. For his part, Mr Hapgood drew attention to a passage from the judgment of Neuberger J in *Financial Services Authority v Rourke* [2002] CP Rep 14 which has been quoted approvingly in subsequent cases. Neuberger J said:

>   "It seems to me that, when considering whether to grant a declaration or not, the court should take into account justice to the claimant, justice to the defendant, whether the declaration would serve a useful purpose and whether there are any other special reasons why or why not the court should grant the declaration."

Here, Mr Hapgood suggested, the declaration claimed would both dispose of part of the relief sought in the claim form and be helpful to the New York Courts. In this connection, Mr Hapgood relied on *AWB (Geneva) SA v North America Steamships Ltd* [2007] EWCA Civ 739, [2007] 2 CLC 117, where Thomas LJ (with whom Chadwick and Latham LJJ agreed) expressed the view (in paragraph 38) that, on the facts of that case, it would be "very helpful" to a Canadian Court "to have the decision on the interpretation of the ISDA Master Agreement by the Commercial Court which has the jurisdiction to adjudicate on these issues in accordance with English law".

24. Mr Miles queried whether the United States Courts would find a declaration on the trust point helpful. He argued that the New York Courts are already familiar with the proposition that the €225 million is the subject of a trust and (which I entirely accept) that they are perfectly capable of dealing with points of foreign law.

25. Even so, I have in the end been persuaded that a declaration from an English Court that the €225 million is held on trust for the holders of the euro-denominated Exchange Bonds and the second defendant (and, correspondingly, that the Republic has no beneficial interest in the money) is likely to be of interest to an American Court having to consider issues relating to the funds. It is noteworthy that, when he denied the turnover motions, Judge Griesa did so by reference to the Foreign Sovereign Immunities Act, not on the basis that the Republic could have no interest in the funds, an issue which he did "not reach". Had there been a ruling from an English Court, the Judge might have felt able to proceed on the basis that the Republic could have no interest in the €225 million. Again, Judge Griesa might not have thought in terms of the money simply being returned to Argentina (as he did at the hearing on 27 June 2014) had it been evident from an English order that it was held on trust exclusively for the holders of the relevant bonds and the second defendant.

26. I might add that the very fact that the Bank has thought it worth opposing the making of the declaration (while not disputing its substance) tends to confirm me in the view that the declaration would serve a useful purpose. Why would the Bank bother if the declaration would do no more than record what everyone concerned already knows full well to be the case?

27. I do have a concern that, as matters stand, the Holdout Creditors have not had a chance to challenge either of the declarations that I am asked to make. The fact that the Republic agrees that the €225 million is held on trust is, as it seems to me, of no real significance: it is in its own interests that that should be so. It is the Holdout Creditors who might want to dispute the existence or terms of a trust and contend that the Republic has a continuing interest in the money.

28. In the circumstances, the best way forward is, as it seems to me, to adjourn the application for the trust declaration to give Holdout Creditors the chance to put forward any arguments they might wish in opposition to it. That can, I think, appropriately be done by informing the attorneys on the record for Holdout Creditors in New York that it is open to their clients to intervene in these proceedings. My provisional view is that, provided the attorneys are given notice of that this week, (a) the relevant Holdout Creditors should be required to inform those acting for the parties to these proceedings by, say, Friday 21 November if they propose to advance submissions on whether the declaration should be made and (b) the application should be adjourned to the hearing already scheduled for 17, 18 or 19 December 2014. Should any or all of the Holdout Creditors argue that the €225 million is not subject to the trust alleged by the claimants, the Court hearing the matter will be reassured that both sides of the argument have been fully ventilated. If no Holdout Creditor chooses to make representations, the Court may still be able to take comfort from the fact that those with an interest in opposing the declaration have had an opportunity to put forward any available arguments.

29. The case for the other declaration that the claimants ask for is, I think, weaker. Mr Hapgood argued that it is an uncontroversial statement of English law, reflecting the

*AWB* case and earlier authorities such as *National Bank of Greece and Athens v Metliss* [1958] AC 509 and *Adams v National Bank of Greece and Athens* [1961] AC 255, and that it would be of great use to the New York Courts in understanding the potential effects of their orders. As it stands, however, the proposed declaration may be open to objection on grounds of both ambiguity and, perhaps more importantly, abstraction. As Mr Miles said, it is expressed as a general point of law, not tied to specific facts.

30. Even so, it seems to me that the right course is to treat the application for this declaration in the same way as that for the other declaration. In other words, the attorneys on the record for Holdout Creditors will be informed that they can intervene in the proceedings and the application will come back before the Court at the December hearing. It will then be a matter for the Judge conducting that hearing to decide whether it is appropriate to grant both, one or neither of the declarations sought. I should add that I am not intending to prevent Mr Miles from repeating the objections to the declarations that he voiced before me.

31. Turning to the application for an injunction, the case for this was, as Mr Hapgood recognised, stronger before the turnover motions were denied. Now that they have been, there can, I think, be no sufficient justification for the grant of injunctive relief at this stage. As Mr Miles pointed out, the order made following the 27 June hearing provided for the Bank to retain the €225 million pending further order of the Court; the only outstanding application at present is one made by holders of euro-denominated Exchange Bonds; and there is no reason to believe that the claimants would not learn in advance of any suggestion that the Court should order the Bank to do anything other than retain the money. It is significant in this context that the Bank has confirmed through its solicitors that it will notify the claimants as soon as reasonably practicable if it becomes aware of any application in the Courts of New York, or any decision of those Courts, that could result in the €225 million being paid out otherwise than to the second defendant or the beneficial holders of the euro-denominated bonds.

32. In short, I decline to grant any injunctive relief, but I shall adjourn the applications for the two declarations mentioned in paragraph 20 above to the hearing already scheduled for 17, 18 or 19 December 2014, with directions for the attorneys on the record for Holdout Creditors to be notified that their clients can intervene in the proceedings if they wish to oppose the making of the declarations. I shall hear counsel further as to the precise terms of the directions that I should give.